OPINION
{¶ 1} In appellate case number 07JE30, defendant-appellant Edward Brown appeals from the compensatory damage jury verdict rendered in the Jefferson County Common Pleas Court for plaintiffs-appellees Jerry and Susan Nolan (the Nolans). In appellate case number 07JE31, plaintiffs-appellants the Nolans appeal the zero punitive damages award rendered in the Jefferson County Common Pleas Court for defendant-appellee Edward Brown. Due to fact that both appeals deal with the same trial, the appeals are addressed in the same opinion.
 {¶ 2} The issues raised in appellate case number 07JE30 are as follows. First, whether our prior ruling in El-Ha'Kim v. AmericanGeneral Life Acc. Co. (Aug. 20,1999), 7th Dist. No. 97CA6, indicates that the trial court improperly denied Brown's motion for a directed verdict. The second issue is whether the trial court erred when it failed to give the jury instructions Brown requested. The third issue is whether the trial court abused its discretion in not giving the jury interrogatories requested by Brown. The fourth issue is whether the trial court erred in failing to grant Brown's motion for new trial. The fifth issue is whether the trial court erred by denying Brown's post-trial motion to adjudicate Conseco's liability. The sixth issue is whether the trial court improperly denied challenges for cause. The seventh issue is whether the trial court erred in three of its evidentiary rulings. *Page 3 
 {¶ 3} Three issues are raised in appellate case number 07JE31. The first issue is whether the trial court abused its discretion in excluding testimony regarding Brown's coverage of liability insurance. The second issue is whether the trial court improperly determined that since no award of punitive damages was rendered although the jury found that Brown acted with actual malice, the Nolans were not entitled to attorney fees. The third issue is the correctness of the trial court's order that costs of the punitive phase were charged to the Nolans. For the reasons expressed below, we hereby affirm the jury's verdicts.
 STATEMENT OF THE CASE {¶ 4} Brown is an insurance agent for Conseco Insurance Company. On May 14, 2001, Brown went to Northwest Elementary School in Smithfield, Ohio. His purpose for going to the school was to sell insurance policies to teachers for heart disease, heart attack or stroke.
 {¶ 5} At that time, Susan Nolan was a teacher at Northwest Elementary School. She proceeded to purchase one of the policies covering heart disease, heart attack or stroke (referred to as the heart policy) for herself and her husband Jerry. According to her, Brown asked her the questions on the heart policy insurance application and filled it out for her. Brown never questioned Susan about diabetes, however, Susan voluntarily told Brown that her husband Jerry had been diagnosed and was being treated for diabetes. Susan contends that Brown told her that this would not affect coverage.
 {¶ 6} Without looking over the insurance application, but after reading the Applicant's Statement before the signature line that indicated that the application was true to the best of her knowledge and that the agent had no authority to waive any of the policy provisions, Susan signed it. On the insurance form it asked if anyone to be insured, which included Jerry, had ever been treated for, among other things, diabetes. The question was answered in the negative.
 {¶ 7} A few days later, on May 18, 2001, a policy was issued to Susan that covered both her and Jerry. In April 2002, Jerry was transported to the hospital complaining of chest pains; he underwent a heart catherization. In May 2002, the Nolans made a timely claim on the heart policy. On September 13, 2002, the Nolans received a letter from Conseco denying the claim and rescinding the policy due to Jerry's diabetic condition. *Page 4 
 {¶ 8} As a result of the above, on September 10, 2003, the Nolans filed a complaint against Brown and Conseco Insurance Company. Brown and Conseco denied that they were ever informed of Jerry's condition.
 {¶ 9} Brown filed a motion for summary judgment in March 2004. He asserted that Susan testified that she read the Applicant's Statement prior to signing the application. As stated above, that statement indicated that the representations on the application were true and that the applicant was aware that the agent had no authority to waive any of the policy provisions. Brown asserted that Susan is solely responsible for any misrepresentations set forth in the application. He cited our decision in EL-Ha'Kim, 7th Dist. No. 97CA6, to support that proposition.
 {¶ 10} Conseco moved for summary judgment in April 2004. It referenced Brown's motion for summary judgment and claimed that summary judgment should be granted for him. Furthermore, it reasoned that if Brown could not be liable, neither could Conseco.
 {¶ 11} The Nolans opposed both motions. On February 16, 2005, the trial court denied Brown's and Conseco's motions.
 {¶ 12} The trial commenced on November 29, 2005. However, the trial was only between Brown and the Nolans; Conseco and the Nolans had reached a settlement for all claims against Conseco. The Nolans and Brown agreed to bifurcate the trial. Thus, the trial occurred in two parts. The first part was for the determination of liability and compensatory damages, which occurred on November 29 and 30, 2005. The Nolans were awarded $100,000 in compensatory damages. The jury found Brown liable and also found his "acts or omission were aggravated or egregious and/or done with a conscious disregard for the rights of others". The second part of the trial, the punitive damages and attorney fees phase, occurred on January 10, 2006. The only evidence presented was financial information about Brown. The jury returned a verdict for no punitive damages. Per instruction of the court, attorney fees were not available because the jury did not award any punitive damages.
 {¶ 13} On January 10, 2006, Brown moved for a new trial or in the alternative a judgment not withstanding the verdict. On May 23, 2007, the court denied the motion. Additionally, Brown filed a post-trial motion titled "Motion to Adjudicate Conseco's Liability and for Setoff of Amount Plaintiffs Received in Settlement with Conseco," which was also denied. *Page 5 
 {¶ 14} The Nolans also filed post-trial motions. In particular, on January 25, 2006, they moved for a new trial on the sole issue of punitive damages. This motion was overruled on May 23, 2007.
 BROWNS' FIRST ASSIGNMENT OF ERROR {¶ 15} "THE TRIAL COURT ERRED BY DENYING BROWN'S MOTION FOR DIRECTED VERDICT AS BINDING PRECIDENT [SIC] ESTABLISHES THAT WHEN APPLICANTS ARE GIVEN THE OPPORTUNITY TO READ AND SIGN AN INSURANCE APPLICATION, THEY ALONE ARE RESPONSIBLE FOR THE REPRESENTATIONS AND WARRANTIES IN THE APPLICATION."
 {¶ 16} Brown moved for directed verdict following opening statements, following the close of the Nolans' case in chief and following the close of his own case in chief. (Tr. 193. 429-435, 516). The motions were all overruled. The basis for the motions was El-Ha'Kim v. American Gen. Lifeand Accident Co. (Aug. 20, 1999), 7th Dist. No. 97CA6.
 {¶ 17} A trial court's decision on a motion for directed verdict presents a question of law, which an appellate court reviews de novo.Groob v. Keybank, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 14; GoodyearTire Rubber Co. v. Aetna Cas. Sur. Co., 95 Ohio St.3d 512,2002-Ohio-2842, ¶ 4. According to Civ. R. 50(A)(4), a motion for directed verdict should be granted when, after construing the evidence most strongly in favor of the party against whom it is directed, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." The court merely considers the law and the sufficiency of the evidence; the court does not weigh the evidence or consider witness credibility. Wagner v. RocheLaboratories, 77 Ohio St.3d 116, 119, 1996-Ohio-85. "`A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence.' O'Day v. Webb (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, paragraph three of the syllabus." Goodyear Tire Rubber Co.v. Aetna Cas. Sur. Co., 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 4.
 {¶ 18} Central to the issue of whether the motion for a directed verdict was properly denied is our decision in El-Ha'Kim. InEl-Ha'Kim, appellant obtained three insurance policies from American General Life and Accident Insurance Company, through their agent Jackson. The first policy was a hospital indemnity policy. In the *Page 6 
application for that policy, the section for pre-existing conditions was answered in the negative even though appellant had pre-existing conditions, i.e. diabetes and heart disease. Appellant signed the application. Within the next month and a half, appellant applied for two more policies, an accident policy and surgical rider. After the policies went into effect, appellant was in an accident and sought coverage under those policies. The insurance company discovered the pre-existing conditions and the failure to disclose those conditions. Thus, it denied coverage, rescinded the policies and refunded the premiums paid.
 {¶ 19} Appellant filed suit against the insurance company and agent. Both the insurance agent and company filed motions for summary judgment, which were granted. Appellant then appealed. On appeal, appellant claimed that the agent knew of his conditions, however, she chose to ignore them in completing the application. He contended that he played no role in colluding with the agent in providing the answers to the application questions. As such, according to him, there was a genuine issue of material fact as to the origin of the answers on the application as well as to whether the agent knew of his conditions. We affirmed the trial court's grant of summary judgment to the agent and the insurance company.
 {¶ 20} The relevant portion of El-Ha'Kim to this case is the portion of the opinion that addressed whether or not the agent should be held liable. We began our analysis of that issue by stating that "whenever an individual signs an insurance application, he will be viewed as having ratified and adopted the answers therein notwithstanding a claimed failure to review the application. Ed Schory Sons, Inc. [v. SocietyNatl. Bank (1996), 75 Ohio St.3d 433, 441], Republic Mut. Ins. Co. [v.Wilson (1940), 66 Ohio App. 522], and Buemi [v. Mutual of Omaha Ins.Co. (1987), 37 Ohio App.3d 113, 119]." Id.
 {¶ 21} This court determined that since El-Ha'Kim signed and ratified all of the applications, we could not hold that the misstatements were the sole product of the agent's actions. We explained:
 {¶ 22} "[A]t the very least appellant colluded with Ms. Jackson [the agent] in providing the false answers on each insurance application.
 {¶ 23} "Even if this court were to assume that Ms. Jackson knowingly placed false information on appellant's application, neither the trial court nor this court are in a position to hold that Ms. Jackson is liable as related to the claims set forth in *Page 7 
appellant's complaint. Based upon our determination in assignment of error number one, it is clear that appellant's actions constituted fraudulent activity." Id.
 {¶ 24} In the first assignment of error we reasoned that appellant had been a party to the fraud because he had admitted that he read the surgical rider which also contains misrepresentations about his pre-existing condition. Thus, he had a duty to report those misrepresentations and his failure to do so made him a participant to the fraud. We specifically stated:
 {¶ 25} "Thus, this is not a situation in which the false statements were solely the product of the insurance agent's actions. Furthermore, the outcome of this case is not dependent upon whether or not appellant read the application but failed to report the false statements to the insured." Id.
 {¶ 26} Those facts render the EI-Ha'Kim decision distinguishable. The evidence, when viewed in the light most favorable to the Nolans, indicates that the false statements were solely the product of Brown. Susan testified that Brown gave her the application and asked that she fill out the top part with her name and address. Brown then took back the application. She testified that he then started reading the application to her with his "pen going one by one." (Tr. 330). She answered the first question with a no and he checked the box for it. And on and on this went until the application was complete. (Tr. 330-331). She testified that while she told Brown about her husband's diabetes, in the questions that he asked, he never asked about diabetes. After the application was completed, Brown handed it to her to sign and she signed it. (Tr. 331). She indicated that she did not read the whole application to make sure the questions were answered as she told the agent to answer them. However, she did state that she did read the Applicant's Statement that was made prior to the signature line.
 {¶ 27} "I looked at the first statement. The statement says that I have read or have had read to me the completed application. The above representations are true to my knowledge and belief. I understand that and I read down through there and I signed it because I didn't read it but it said that I have had it read to me." (Tr. 331).
 {¶ 28} Furthermore, unlike the appellant in EI-Ha'Kim, the Nolans did not receive a copy of the completed application to read. The appellant in EI-Ha'Kim did and he admitted that he read the application, which contained false statements concerning his pre-existing condition. Upon discovery of those statement he failed to *Page 8 
notify the insured. Those facts show that appellant inEI-Ha'Kim had an active role in the fraud. There are no facts in the case currently before us that when viewed in the light most favorable to the Nolans, show that Susan had an active role in the deception.
 {¶ 29} Moreover, in EI-Ha'Kim, we stated:
 {¶ 30} "So long as the applicant only took what could be viewed as a passive role in the fraudulent activity, he or she would be permitted to pursue an action against the insurance agent in the event coverage was terminated at a later date." Id.
 {¶ 31} The Nolans' role could be classified as passive. Therefore, they were permitted to pursue an action against Brown, the agent.
 {¶ 32} Consequently, considering the above, EI-Ha'Kim does not indicate that a directed verdict should have been granted to Brown. Thus, the trial court did not commit error. This assignment of error lacks merit.
 BROWN'S SECOND ASSIGNMENT OF ERROR {¶ 33} "THE TRIAL COURT ERRED BY FAILING TO PROPERLY INSTRUCT THE JURY ON BINDING PRECEDENT, SEPARATION OF DEFENDANTS AND SPECULATION/DAMAGES."
 {¶ 34} Under this assignment of error, Brown argues that the trial court erred when it failed to give the jury instructions that he wanted. He argues there were three omitted instructions.
 {¶ 35} A determination as to which jury instructions are proper is a matter left to the sound discretion of the trial court. State v.Guster (1981), 66 Ohio St.2d 266, 271. We review the trial court's refusal to give the requested jury instructions under an abuse of discretion standard. State v. Wolons (1989), 44 Ohio St.3d 64, 68. An abuse of discretion is more than merely an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. An appellate court's duty is to review the instructions as a whole, and, if taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. Wozniak v. Wozniak (1993), 90 Ohio App.3d 400, 410.
 {¶ 36} The first alleged erroneous omission is that the trial court did not instruct on the law of EI-Ha'Kim regarding that ratification. While the trial court did not provide *Page 9 
an in depth instruction on EI-Ha'Kim, it nevertheless gave an instruction on the failure to read an insurance policy. It instructed:
 {¶ 37} "As to comparative negligence, the — the Nolans were negligent if they failed to use that care for their own safety which reasonably prudent insureds would use under the same or similar circumstances.
 {¶ 38} "An insured has a duty to exercise reasonable care for their own protection, including reading their insurance policies." (Tr. 577-578).
 {¶ 39} Such an instruction cannot be said to have been a misstatement of the law. Moreover, since we have already indicated a distinction between the facts of this case and EI-Ha'Kim, the trial court did not err in failing to give a specific instruction on EI-Ha'Kim and ratification.
 {¶ 40} The second alleged erroneous omission is that the trial court failed to instruct the jury that Brown was not the insurance company, Conseco was. Brown wanted the following instruction given on this issue:
 {¶ 41} "Mr. Brown is not liable to Plaintiffs for the negligence or misconduct of others. From the evidence introduced in this case, you may conclude that employees of Conseco acted in an inappropriate manner towards Plaintiffs during the claims review process. Plaintiffs remain free to file suit, and to pursue their claims for inappropriate conduct on the part of Conseco's employees, directly against Conseco. You must not allow the negligence or misconduct of Conseco or its employees to impact in any way your deliberations in this case, wherein Plaintiffs allege inappropriate conduct on the part of Mr. Brown, alone. Mr. Brown is not an employee of Conseco. Your determination as to whether Mr. Brown is liable to Plaintiffs for fraud, negligence, or negligent misrepresentation must be based solely on Mr. Brown's acts or omissions to act on May 14, 2001." (Tr. 597-598).
 {¶ 42} The jury instruction given stated, in pertinent part:
 {¶ 43} "The plaintiffs in this case are Jerry Brown — I'm sorry, Jerry Nolan and Susan Nolan. They alleged that the Defendant Edward Brown, an insurance agent, inaccurately recorded information told to him by Mrs. Nolan while he was taking an application for an insurance policy.
 {¶ 44} "* * *
 {¶ 45} "Your determination as to whether Mr. Brown is liable to Plaintiffs for fraud, negligence or negligent misrepresentation must be based solely on Mr. Brown's *Page 10 
acts or omissions to act and not on Conseco's exclusive negligence or misconduct." (Tr. 572-577).
 {¶ 46} The instruction given by the court is more succinct than the one Brown requested. That said, the essence of both is that Brown is not Conseco and that he could not be found liable for the exclusive acts of Conseco. Consequently, as the fundamental principles espoused by both are the same, we cannot find that the trial court abused its discretion. Thus, this argument has no merit.
 {¶ 47} The last alleged error concerns the speculative damages instruction. The court only gave a portion of the instruction Brown requested. It instructed:
 {¶ 48} "Damages must be reasonable. If you find that Plaintiffs are entitled to a verdict, you may award only such damages as will reasonably compensate Plaintiffs for the damages as you find from the preponderance of the evidence. You may not speculate as to damages." (Tr. 575).
 {¶ 49} The omitted portion that Brown wanted to be given is as follows:
 {¶ 50} "You are not permitted to award speculative damages, plaintiffs must prove their claim to damages with reasonable certainty, and must introduce evidence of specific facts which support a finding that Plaintiffs were damaged by Mr. Brown's conduct. Damages must be calculable using evidence introduced into this trial. If Plaintiffs fail to introduce evidence of the specific facts which support the specific amount of their claimed damages, then plaintiffs' damages are speculative and you must return a verdict for Mr. Brown." (Tr. 599).
 {¶ 51} Brown's instruction sought to have the jury charged in a manner that it could only return a compensatory damages verdict of $4,265. This amount was the Nolans pecuniary loss — amount of money the Nolans would have been entitled to under the heart policy for Jerry's hospital stays if the heart policy was in effect. (Tr. 400-401). However, the Nolans also sought damages for "their emotional distress, mental anguish, inconvenience, annoyance, humiliation, embarrassment, frustration, anxiety and other general damages." (Tr. 578).
 {¶ 52} Susan testified that now, given Jerry's heart problems and diabetes, he cannot obtain health insurance. She discussed her frustration with trying to have Conseco provide coverage for Jerry. She indicated that she thought she had done something good, but because of Brown not accurately transmitting the information she provided, it was all for naught. Brown testified that at the time Susan applied for *Page 11 
insurance Jerry would have been insurable under another policy despite the fact that he had diabetes.
 {¶ 53} It is well-settled in Ohio that a tortfeasor remains liable forall damages proximately caused by his negligence. Bendner v. Carr
(1987), 40 Ohio App.3d 149, 154. The Nolans claimed that Brown was negligent. In addition to pecuniary damage, pain and suffering, inconvenience, frustration and mental anguish can all flow from negligence and be considered injury. Thus, as negligence was pled and the Nolans sought general damages for emotional distress, mental anguish, inconvenience, annoyance, humiliation, embarrassment, frustration and anxiety, we hold that the trial court did not abuse its discretion in failing to give an instruction that limited the damages to pecuniary damages. This assignment of error lacks merit.
 BROWN'S THIRD ASSIGNMENT OF ERROR {¶ 54} "THE TRIAL COURT ERRED IN ISSUING A SINGLE JURY INSTRUCTION BLENDING TOGETHER THREE CAUSES OF ACTION AND A JURY INTERROGATORY ON PUNITIVE DAMAGES WITHOUT A REQUISITE FINDING OF CLEAR AND CONVINCING EVIDENCE."
 {¶ 55} Under this assignment of error, Brown alleges two errors with the jury interrogatories. Civ. R. 49(B) indicates that upon request of the party, the trial court shall submit written interrogatories to the jury. That said, the trial court retains discretion to reject interrogatories that are inappropriate in form or content. Ragone v.Vitali Beltrami, Jr., Inc. (1975), 42 Ohio St.2d 161, paragraph one of the syllabus. A court may reject proposed interrogatories that are ambiguous, confusing, redundant, or otherwise legally objectionable.Ramage v. Central Ohio Emergency Serv., Inc., 64 Ohio St.3d 97, 107,1992-Ohio-109. Proper jury interrogatories must address determinative issues and must be based upon trial evidence. Id. The standard under which we review a trial court's decision whether to submit a proposed interrogatory is abuse of discretion. Freeman v. Norfolk W. Ry.Co., 69 Ohio St.3d 611, 614, 1994-Ohio-326, citing Ragone,42 Ohio St.2d 161, paragraph one of the syllabus.
 {¶ 56} The first alleged error claims the trial court abused its discretion when it blended together the three causes of action of negligence, fraud and misrepresentation into one interrogatory. The interrogatory combining the causes of action read as follows: *Page 12 
 {¶ 57} "1. Do you find that the defendant, Edward Brown, was negligent and/or that he committed misrepresentation and/or that he committed fraud in connection with the insurance policy he sold to the plaintiff, Susan Nolan, and that such negligence caused damages to the plaintiffs?"
 {¶ 58} Interrogatory number two then asked if the jury found that the plaintiffs were negligent in causing any of their own damages. Interrogatory number three requested an apportionment of negligence to each party if the jury answered the second interrogatory in the affirmative. Interrogatory number four then asked for the amount of damages. Lastly, interrogatory number five asked for a finding of actual malice.
 {¶ 59} Brown proposed different jury interrogatories for all three causes of action. In fact, he proposed a total of fifteen jury interrogatories. These interrogatories, in essence, are divided into three parts. The first six interrogatories are for fraud, the next five are for misrepresentation, and the next two are for negligence. The proposed interrogatories are laid out in the form that the jury would first determine if Brown was liable for fraud. If it determined that he was then the jury would not render a decision on misrepresentation or negligence. But if it found that the Nolans had not proven any one element of fraud, the interrogatories instructed the jury to move to the interrogatories on misrepresentation. If the jury found him liable of misrepresentation, then the jury would not render a determination on negligence. However, if it found him not liable, the jury was instructed to move to the interrogatories on negligence.
 {¶ 60} In support of his position, Brown cites this court to the Fifth Appellate District case of Haney v. Zimmer Orthopedic SurgicalProducts, 5th Dist. No. 2004 AP12 0074, 2005-Ohio-4345. In that case, the trial court combined the requested four interrogatories into two interrogatories. In doing so, it combined in one interrogatory the three elements that were required to be proved to establish a workers' compensation claim. Its reason for doing so was that it believed that two of the elements ("in the course of employment" and "arising out of the employment") merged together. The Fifth District found that it was error for the trial court to combine the four interrogatories. It held that the trial court's reasoning for doing so was incorrect. It explained that the Ohio Supreme Court specifically indicated in a previous case that *Page 13 
"in the course of employment" and "arising out of the employment" had two different meanings. Thus, they do not merge together.
 {¶ 61} It must be noted that in Haney, the appellate court's reasoning was not based solely on the combining of the interrogatories. Rather, it was also based upon the jury instruction. It explained:
 {¶ 62} "Based upon the above case law from the Ohio Supreme Court, we find the trial court erred when it combined the `in the course of and `arising out of prongs into one jury instruction. The juryinstruction misled the jury, in a manner materially affecting Zimmer's substantial rights, as it did not convey, to the jury, that separate prongs had to be established before appellee would be entitled to participate in the workers' compensation fund." Id. at ¶ 56. (Emphasis added).
 {¶ 63} It then explained that the jury instruction contained in Ohio Jury Instructions does give separate instructions for the elements. Id. at ¶ 57.
 {¶ 64} The case at hand is distinguishable from Haney. The jury instruction provided here clearly spells out all the elements of each cause of action:
 {¶ 65} "First, the Nolans allege that the Defendant is liable for fraud. Fraud is a civil wrong. It is a deception practiced with a view to gaining an unlawful or unfair advantage.
 {¶ 66} "As to the Plaintiffs' claim of fraud, the Plaintiffs must prove by the greater weight of the evidence each of the following elements: A, a false representation of fact was made with knowledge of its falsity or with utter disregard or recklessness about its falsity so that that knowledge may be found; B, the representation was material to the transaction; C, the representation was made with the intent of misleading Plaintiff into relying upon it; D, the Plaintiff was justified in relying upon the representation and did, in fact, so rely; E, the Plaintiff was injured and the injury was directly caused by their reliance on the representation.
 {¶ 67} "Material represent — material representation. The representation must be material; that is, it must be important, necessary or having influence on the transaction. It must be substantial and important that it influenced the person to whom it was made.
 {¶ 68} "A representation is false when it is not substantially true. The truth or falsity of a representation depends on the natural and obvious meanings of the words taking into consideration all the surrounding circumstances. *Page 14 
 {¶ 69} "A person knows a representation is false when he is aware it is not substantially true.
 {¶ 70} "A person intends to mislead another to rely on representation when it is his purpose to mislead. A person's intent is known only to himself unless he expresses it to others or indicates it by his conduct. Intent is determined from the way in which the representation is made, the means used and all the facts and circumstances in evidence.
 {¶ 71} "Second, the Nolans allege that Brown is liable for misrepresentation. A person is liable for misrepresentation if in the course of his business, profession or employment or in any other transaction in which he has a pecuniary interest he supplies false information for the guidance of another in his business transaction and said false information is justifiably relied upon.
 {¶ 72} "The Plaintiff must be directly damaged by the reliance on the representation. This means that the damage was caused by the representation in a natural and continuous sequence and without which the damage would not have occurred.
 {¶ 73} "* * *
 {¶ 74} "The Nolans allege that Brown was guilty of negligence in the performance of his duties as an insurance agent.
 {¶ 75} "To prevail on the negligence claim, the Nolans must prove by a preponderance of the evidence that Brown failed to exercise ordinary care; that is, he failed to act as a reasonably prudent insurance agent under the same or similar circumstances.
 {¶ 76} "The elements of negligence are, 1, the existence of a duty; 2, breach of that duty and, 3, damages proximately caused by that breach.
 {¶ 77} "In order to establish that Brown was negligent, the Plaintiffs must prove all of these elements by the greater weight of the evidence.
 {¶ 78} "The existence of a duty depends on the foreseeability of the injury, meaning whether a reasonably prudent person would have anticipated that the injury could result from the performance or failure to perform an act.
 {¶ 79} "* * *
 {¶ 80} "Negligence and proximate cause are separate and distinct issues. *Page 15 
 {¶ 81} "If you find that Defendant Brown was negligent, you must also decide if such negligence proximately caused the Nolans' damages.
 {¶ 82} "Proximate cause is an act or failure to act which in the natural and continuous sequence directly produces the damage and without which the damage would not have occurred.
 {¶ 83} "Proximate cause occurs when the damage is the natural and foreseeable result of the act or failure to act.
 {¶ 84} "The test for foreseeability is not whether a person should have foreseen the damage exactly as it happened to the specific person. The test is whether under all the circumstances a reasonably careful person would have anticipated that an act or failure to act would likely result in some damage." (Tr. 573-577).
 {¶ 85} As can be seen, this instruction clearly provides the elements of all the claims. The instruction directed the jurors that if they found him liable for any one of those causes of action, then to enter a general verdict in the Nolans favor. (Tr. 576). The jury was provided with a written copy of this instruction. Furthermore, the fact that the causes of action were combined into one interrogatory would not affect the ability of the jury to find actual malice, since that finding can be made even in negligence cases. Burns v. Prudential Securities,Inc., 167 Ohio App.3d 809, 2006-Ohio-3550, ¶ 101. As the Nolans suggest, the only possible reason for separating the causes of actions is for the benefit of Brown's insurance company to determine whether coverage is applicable (typically intentional acts are not covered, i.e. fraud). Thus, even though the trial court combined the causes of action into one interrogatory, we cannot find that it abused its discretion. This argument lacks merit.
 {¶ 86} The second alleged erroneous jury interrogatory was number five. This jury interrogatory asks the jury to determine whether Brown acted with actual malice, i.e. are the Nolans entitled to punitive damages. It stated:
 {¶ 87} "Do you find that defendant's acts or omissions were aggravated or egregious and/or done with a conscious disregard for the rights of others?"
 {¶ 88} The jurors were required to answer by checking either yes or no. They answered the question in the affirmative.
 {¶ 89} It is noted that the proposed jury interrogatories submitted by Brown did not recommend a jury interrogatory on the issue of whether his conduct rose to the level entitling the Nolans to punitive damages. The interrogatory given is the one *Page 16 
proposed by the Nolans. Thus, unlike the above analysis, we are not reviewing the trial court's failure to submit a proposed jury interrogatory, but rather its decision to submit a jury interrogatory.
 {¶ 90} As stated above, under Civ. R. 49, a trial court shall submit interrogatories requested by the parties. That said, the interrogatory may be rejected if it is ambiguous, confusing, redundant, or otherwise legally objectionable. Brown argues that the interrogatory is erroneous because it failed to provide that such a finding must be proven by clear and convincing evidence. The trial court's failure to provide an interrogatory stating as such, according to Brown, allowed the jury to find under the lesser standard of proof — preponderance of the evidence.
 {¶ 91} We find that the interrogatory as given is not confusing, ambiguous, or redundant. Nor was the interrogatory legally objectionable. The interrogatory does not misstate the burden of proof, rather, it fails to state it. However, that omission is not fatal. If the jury was aware of the proper burden of proof through the jury instruction, then the omission does not amount to an abuse of discretion.
 {¶ 92} Here, as the Nolans point out, the jury instructions clearly indicated the required burden of proof for a finding of aggravated conduct. It states:
 {¶ 93} "You will also have to decide whether Defendant is guilty of aggravated conduct.
 {¶ 94} "To answer this question, you must decide if the following elements have been proven by clear and convincing evidence: Number 1, that Brown's acts or failures to act demonstrated malice, aggravated or egregious fraud, oppression or insult, and, number 2, that the Nolans have presented proof of actual damages that resulted from Brown's acts or failure to act.
 {¶ 95} "Clear and convincing. To be clear and convincing the evidence must have more than simply a greater weight than the evidence opposed to it and must produce in your minds a firm belief or conviction about the truth of the matter.
 {¶ 96} "In deciding this issue, you should consider and apply the following definitions.
 {¶ 97} "Malice. Malice includes a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. *Page 17 
 {¶ 98} "Fraud is aggravated if it is accompanied by the existence of malice or ill will. Fraud is egregious if the fraudulent wrongdoing is particularly gross." (Tr. 578-579).
 {¶ 99} Thus, as the jury was instructed on the proper proof for an actual malice finding, and was given a copy of the jury instruction for deliberation purposes, this court will not find an abuse of discretion in giving jury interrogatory number five without indicating the burden of proof. Brown's argument to the contrary is meritless. This assignment of error in its entirety is without merit.
 BROWN'S FOURTH ASSIGNMENT OF ERROR {¶ 100} "THE TRIAL COURT ERRED BY DENYING BROWN'S MOTION FOR NEW TRIAL AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT BECAUSE THE VERDICT WAS CONTRARY TO LAW AND FLAWED."
 {¶ 101} Brown filed a motion for new trial or in the alternative a motion for judgment notwithstanding the verdict. All arguments raised in this assignment of error were raised in that motion.
 {¶ 102} When considering a motion for JNOV, a trial court employs the same standard used in granting a motion for a directed verdict.Texler v. D.O. Summers Cleaners Shirt Laundry Co., 81 Ohio St.3d 677,679, 1998-Ohio-602. Thus, we review it de novo. Schafer v. RMSRealty (2000), 138 Ohio App.3d 244, 257. However, we review the denial of a motion for new trial under an abuse of discretion standard of review. McCrae v. Wal-Mart Stores, Inc., 7th Dist. No. 2005-Ohio-4472, ¶ 14, citing State v. Hawkins (1993), 66 Ohio St.3d 339, 350.
 {¶ 103} The first argument made is based upon El-Ha'Kim and the reasoning set forth in assignment of error number one for why a directed verdict should have been granted. This issue has been fully discussed in the first assignment of error. Thus, we rely on our reasoning in the first assignment of error and find no merit with this argument.
 {¶ 104} The second argument contends that the jury returned a compromised verdict. The Twelfth District has explained:
 {¶ 105} "In considering whether a jury reached a compromised verdict, it is necessary to `examine the `totality of circumstances' and consider any indicia of compromise apparent from the record and other factors that may have caused a verdict for damages that would be inadequate if the jury actually found liability.' *Page 18 Yarbrough v. Sturm, Ruger Co. (C.A.5, 1992), 964 F.2d 376, 379, citing Pagan v. Shoney's Inc. (C.A.5, 1991), 931 F.2d 334, 339. However, even if a compromised verdict has in fact been rendered, such verdict will be upheld on appeal where `[t]here is no evidence of passion, or prejudice or of wanton wrong' on the part of the jury. Young v.Snow (App. 1923), 2 Ohio Law Abs. 473." Airborne Express, Inc. v. Sys.Research Laboratories, Inc. (1995), 106 Ohio App.3d 498, 510.
 {¶ 106} Prior to addressing Brown's arguments as to why the verdict was compromised and was the result of passion or prejudice, it is noted that the Nolans contend that a compromised verdict analysis is not justified here. As the Nolans point out, Pagan defines a compromised verdict as:
 {¶ 107} "A compromised verdict occurs when a jury which is unable to agree on liability compromises that disagreement and awards inadequate damages." 931 F.2d 334, 339.
 {¶ 108} Here, there is no evidence that the jury was unable to agree on liability. There is no evidence that the liability phase was a close call. Thus, it is unclear, in this case, how the verdict in this instance is compromised. Furthermore, as the Nolans point out, a compromised verdict usually results in too low of a damage award. Here, Brown argues that the award is too high. How could a jury compromise liability and then award excessive damages? It seems that Brown's argument is illogical. He should be arguing that the award was influenced by passion and prejudice, not that it was compromised.
 {¶ 109} Consequently, for that reason alone, the argument is without merit. Regardless, in the interest of justice, we will address Brown's arguments.
 {¶ 110} Brown contends that the Nolans, in closing argument, requested $200,000 in damages. He asserts that $100,000 is almost the mid point between the $200,000 requested and the $4,265 that the Nolans expert testified they would be entitled to under the heart policy if it was in effect. Thus, according to him, that is evidence that the verdict was compromised.
 {¶ 111} The argument is factually incorrect. The Nolans did not ask for a specific amount of damages. Brown, specifically in closing arguments, stated that all the Nolans could prove was $4,200. *Page 19 
 {¶ 112} "I anticipate that Plaintiffs' Counsel is going to ask for damages that are quite a big number. The only testimony in this case concerning actual damages that have occurred, according to their expert, is approximately $4,200.00." (Tr. 558).
 {¶ 113} The Nolans responded to that argument with the following:
 {¶ 114} "What damages are appropriate? They said, `Well, it's only $4,200. That's all they proved.' Heck, the rest of it he said would be speculation. Speculation that she was frustrated. Speculation that she was upset. Speculation that her husband got upset talking to these people. Speculation that they're not extraordinarily concerned now because they could never get this coverage, which on May 14, 2001, they could have got.
 {¶ 115} "* * *
 {¶ 116} "I'm not going to — he — he — you know, he told you `Mr. Blass is going to ask you for a huge number for damages.' No, I'm not. I'm going to ask you to think about it. I'm going to ask you to compare some things. I'm going to ask you to compare $200,000 in selling these policies in one year to what these people have been through for five and what they're going to go through now. That's what I'm going to ask you to do." (Tr. 558, 562, 564).
 {¶ 117} Thus, the Nolans did not request $200,000 in damages. Any argument to the contrary is meritless.
 {¶ 118} Brown also contends under this second argument that the record is replete with the admission of improper evidence such as Brown's tax liens and application for employment with Conseco and the record also shows that the Nolans allegedly improperly referred to Brown as an insurance company. He also directs this court to the Nolans pecuniary damages that were testified to by their own expert. He asserts that these alleged errors contributed to the comprised verdict.
 {¶ 119} Each one of these arguments are addressed in some manner throughout this opinion. For instance, the alleged improper admission of tax liens, the Conseco application, and the alleged referral to Brown as an insurance company are all discussed in the seventh assignment of error. As is explained more in depth below, there was no error in the admission of that evidence and the Nolans did not refer to Brown as an insurance company.
 {¶ 120} Likewise, the issue with the Nolans expert testifying to pecuniary loss of $4,265 was discussed in the second assignment of error. As was explained under that *Page 20 
assignment, the Nolans did not only seek the amount of money they would have been entitled to under the policy if it had been in effect, which was $4,265, they also sought compensation for frustration, humiliation, and the like. Thus, as with the second assignment of error, this argument lacks merit. Consequently all of the arguments made in this second argument are without merit.
 {¶ 121} Brown's third alleged error under this assignment of error argues that the jury interrogatory for the punitive inquiry did not contain the requisite burden of proof. In the third assignment of error, we addressed this argument and found it to be without merit.
 {¶ 122} That said, in this argument, Brown raises a new point. He contends that after the jury returned the compensatory verdict and were advised that they would have to come back, the jury asked the bailiff why that was. The bailiff told the jury that the next phase of the trial was to determine punitive damages. The jurors then advised the bailiff that they did not want to give Plaintiffs any more money and indicated that is why they gave her $100,000. The bailiff informed the court of this conversation. The court then informed the attorneys of the conversation. This discussion was held off the record in the court's chambers. Ms. Tark, counsel for Brown, provided an affidavit about the discussion.
 {¶ 123} The court's off the record discussion regarding this issue was discussed prior to the punitive phase. The trial court explained that the jury was instructed on the proper burden of proof and it presumed that it followed that instruction. It further added, regarding the affidavit filed by Brown:
 {¶ 124} "And as to number 13, the actual quotes that are there, I don't recall what the actual quote was. I did indicate to the attorneys that the bailiff had overheard one of the jurors say something to the effect of `we don't want to give them anymore money.' And some of the effect of what the actual quote was, `that I would have given,' would have been at least secondhand because I didn't hear what they said. I was just trying to advise the attorney so they could act accordingly.
 {¶ 125} "And although Ms. Tark may truly believe that that's what was said I can't say that was said or what wasn't said." (Tr. 12-13).
 {¶ 126} A somewhat compelling argument can be made that the above colloquy indicates that the compensatory damages award included a punitive component. The bifurcated trial may have been confusing to the jury. In the compensatory phase, the *Page 21 
jury was instructed on compensation and liability and was also instructed on actual malice. However, there was no mention as to why this actual malice finding was needed. While the jury was not instructed on punitive damages at that point, with the finding of actual malice, it is possible that they added in punitive damages without being instructed to do so. The jury may have thought that its actual malice finding could be used for computation of the amount of compensatory damages, rather than being used for a determination of whether punitive damages could be granted. The instruction did not explain why the actual malice finding was needed or how that finding was to be used for determination of damages, either compensatory or punitive.
 {¶ 127} However, given the record we cannot find that a new trial is warranted on compensatory damages. The problem is that this court does not definitively know what the conversation was between the juror/jurors and the bailiff. And for that matter, neither do the attorneys. The judge informed the attorneys what the bailiff told him about the conversation; it was second hand information to the judge, third hand information to the attorneys. Furthermore, the original discussion that happened after the information was given to the judge was not put on the record. As such, Brown's argument for a new trial on compensatory damages lacks merit; we cannot find that the trial court abused its discretion in not granting a new trial on that basis. In conclusion, this assignment of error is without merit.
 BROWN'S FIFTH ASSIGNMENT OF ERROR {¶ 128} "THE TRIAL COURT ERRED BY DENYING BROWN'S MOTION TO ADJUDICATE CONSECO'S LIABILITY AND FOR SET OFF OF AMOUNT PLAINTIFFS RECEIVED IN SETTLEMENT WITH CONSECO."
 {¶ 129} As explained previously, Conseco settled with the Nolans. Following trial, Brown filed a motion to adjudicate Conseco's liability and for setoff of the amount the Nolans received in the settlement with Conseco. The trial court overruled the motion and explained:
 {¶ 130} "The controlling case on the setoff issue is Fidelholtz v.Peller [1998], 81 Ohio St.3d 197, * * *, which holds that without a prior determination of fault of a settling tortfeasor, there is no setoff under Ohio Revised Code § 2307.33(f) [subsequently *Page 22 
repealed]. Further, under Fidelholtz, `the determination may be a jury finding, a judicial adjudication, stipulations of the parties, or the release language itself.
 {¶ 131} "Under Fidelholtz, the, `there is a presumption that non-settling defendants are solely responsible for the plaintiff's injuries and, therefore, not entitled to a setoff.' In re MiamisburgTrain Derailment Litigation (1999), 132 Ohio App.3d 571, 585. It is Brown's burden to overcome this presumption by one of the methods specifically mandated by Fidelholtz. Brown has failed to do so, and, therefore, his request for a setoff is denied. Further, the defendant did not raise this issue by any pretrial motions in order to get a judicial adjudication prior to trial." 05/23/07 J.E.
 {¶ 132} This reasoning is sound and in conformity with Fidelholtz.Fidelholtz, makes it clear that prior to a non-settling defendant being entitled to a setoff, there must be a determination that the settling defendant is a person "liable in tort." Id., syllabus. That determination can be made in four different ways — through a jury finding, a judicial adjudication, stipulation of the parties, or the release language of the settlement.
 {¶ 133} Undoubtedly, here we do not have a jury finding as to Conseco's liability. Brown never requested and the jury was not presented with an interrogatory on Conseco's liability. Instead, the jury was specifically instructed that it was not to consider any acts of Conseco when determining liability. (Tr. 577). Furthermore, the record is devoid of any stipulation by the parties as to Conseco's liability. Likewise, the Conseco/Nolan settlement is confidential and therefore, we have no language to determine whether the release language constituted an admission of liability. Thus, we do not have a jury finding, stipulation or the language of release to indicate that a setoff can occur.
 {¶ 134} As a consequence, unless there was a judicial adjudication of liability, there is no means for a setoff. In Miamisburg, the court indicated that summary judgment or a partial summary judgment would be a judicial adjudication. Likewise, a directed verdict could also be a judicial adjudication.
 {¶ 135} In this case, we have neither of those scenarios. Instead, after the jury determined Brown's liability, he requested judicial adjudication of Conseco's liability. This is not the correct means to seek a judicial adjudication. As stated above, a setoff is sought through a finding of liability. That liability is either admitted by stipulation or in the settlement agreement, found by the jury or found by the court through judicial *Page 23 
adjudication. When it is found by the court, it is found because there is no genuine issue of fact and reasonable minds would find for the party moving for the adjudication. However, if there are issues, then the question would have to go to the jury. When a defendant attempts to have an issue of the settling defendant's liability adjudicated by the trial court in the manner it did here, it is trying to bypass the jury. If the trial court found that there was a genuine issue of material fact as to liability, what option would it have? It could not send the issue to the jury since it had already decided the case and was no longer in service. Thus, requesting judicial adjudication after the jury has been dismissed is not a proper means to seek judicial adjudication. Thus, for that reason, the request was not timely made and the trial court appropriately denied the request.
 {¶ 136} The next argument Brown makes is that by not allowing the setoff, the trial court allowed double recovery. This argument is not persuasive. As explained above, Fidelholtz is applicable and failure to act in accordance to that holding is detrimental to a non-settling defendant. Furthermore, in Allan v. King Tool Mfg. (Dec. 30, 1999), 7th Dist. No. 98CA14, this court held that since the jury did not make a determination that the settling party was liable, and in fact was never presented with that issue, it was incorrect for the trial court to setoff. In making this holding, this court cited to two cases. The first being Fidelholtz, and the second was Howard v. Seidler (1996),116 Ohio App.3d 800. In Howard, this court held that a party is not entitled to a setoff when a danger of a double recovery is not present. This court further held that a danger of a double recovery is not present when the trial court instructs the jury to determine the total amount of damage caused by the defendants presently before it. Id.
 {¶ 137} As stated above, the jury here was instructed to consider only Brown's act when determining liability. Thus, there was no danger of double recovery in this case. Regardless, it appears that theFidelholtz case is used to ensure that there is not double recovery and that a non-settling party must use that procedure to ensure that double recovery does not occur. Consequently, as explained above,Fidelholtz was not followed and thus, a setoff is not permitted. This assignment of error lacks merit.
 BROWN'S SIXTH ASSIGNMENT OF ERROR *Page 24 {¶ 138} "THE TRIAL COURT ERRED IN FAILING TO EXCUSE PREJUDICIAL JURORS FOR CAUSE IMPROPERLY FORCING BROWN TO EXHAUST ALL HIS PEREMPTORY CHALLENGES."
 {¶ 139} Under this assignment of error, Brown argues that the trial court improperly denied his challenge for cause on three jurors and, as such, he was required to use his remaining two peremptory challenges to remove two of those three jurors. Thus, according to Brown, he was given fewer peremptory challenges than provided by law.
 {¶ 140} The determination whether a prospective juror should be disqualified for cause is a discretionary function of the trial court.Berk v. Matthews (1990), 53 Ohio St.3d 161, syllabus. Such a determination will not be reversed on appeal absent an abuse of discretion. Id. That said, Ohio has recognized that "where the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause in a criminal case may be prejudicial." State v. Cornwell, 86 Ohio St.3d 560, 564, 1999-Ohio-125, citing Hartnett v. State (1885), 42 Ohio St. 568. Appellate courts have applied that holding in the civil context. Burns v. PrudentialSecurities, Inc., 167 Ohio App.3d 809, 2006-Ohio-3550, ¶ 78; Gibbs v.Zadikoff, 1st Dist. No. C-060869, 2007-Ohio-4883, ¶ 39.
 {¶ 141} Brown asserts that the trial court should have granted his challenge for cause on potential juror Jane Swartz, potential juror Michael Jackson and juror David Miller. Brown challenged potential juror Swartz because she is a cousin through marriage to the Nolans' witness Cheryl DeYarmon. (Tr. 125-126).[1] Swartz indicated that she is friends with DeYarmon and related to her through marriage; "probably fourth, fifth cousins." (Tr. 116, 120, 123). The trial court asked whether Swartz would believe DeYarmon more because she is her cousin. Swartz indicated that she would not. (Tr. 116). She also indicated that she would not believe DeYarmon less because she knows her. (Tr. 116). Brown's attorney asked Swartz whether her relationship with DeYarmon would prejudice her in anyway. (Tr. 124). She indicated that it would not. (Tr. 124). *Page 25 
 {¶ 142} R.C. 2313.42(G) provides that a prospective juror may be challenged for cause if they are related "by consanguinity or affinity within the fourth degree, to either party, or to the attorney of either party." There is no provision that a potential juror would be disqualified for being related to a witness. Furthermore, Swartz's answers indicated that she could be a fair and impartial juror. The trial court has discretion in determining a juror's ability to be impartial. State v. Williams (1983), 6 Ohio St.3d 281, 288. "[D]eference must be paid to the trial judge who sees and hears the juror."Wainwright v. Witt (1985), 469 U.S. 412, 426. Thus, we do not find that the trial court erred in denying the challenge for cause.
 {¶ 143} Like potential juror Swartz, Brown challenged potential juror Jackson based on his familiarity with DeYarmon and her children. (Tr. 145). Jackson indicated that he has lived up the road from DeYarmon his whole life, he grew up with her sons, and considered them friends. (Tr. 134-135, 139, 143). He stated that he considered DeYarmon an acquaintance. The Court asked him whether based on the fact that he knew her and her sons, would he give her more credence. (Tr. 136-137). Jackson indicated that he would not. (Tr. 137). The trial court also asked if he would give her less credence because he knew her and her sons. Jackson stated that he would not. (Tr. 137). The Nolans' counsel asked Jackson whether based on the fact that he grew up with DeYarmon's sons, would Jackson be able to be "open-minded and listen to all the testimony, not just Ms. DeYarmon's but everybody's and weigh her testimony against everybody else's." (Tr. 139). Jackson indicated that he could. (Tr. 139).
 {¶ 144} Given the above, the trial court did not abuse its discretion when it failed to remove Jackson for cause. Despite his familiarity with DeYarmon's family, his answers demonstrated that he could be fair and impartial; he indicated that he would not lend any more or less credence to DeYarmon's testimony based on his relationship with the family. The trial court's failure to remove for cause a potential juror who is familiar with the family of a party or the family of a witness does not amount to an abuse of discretion when the potential juror indicates that he can remain fair and impartial. State v. Freshwater, 11th Dist. No. 2002-L-041, 2004-Ohio-384, ¶ 29. Considering that neither Jackson nor Swartz were not unqualified, Brown was not forced to use his peremptory challenges to eliminate them and, thus, he could have used one of those challenges on juror David Miller. *Page 26 
 {¶ 145} Regardless, juror David Miller was not unqualified to sit as a juror. Brown contends that juror Miller was unqualified because Miller indicated that he looked up to teachers and there was a chance he would believe a teacher over a non-teacher. Miller stated that his wife is a teacher and that there is a chance he would believe a teacher over a non-teacher. (Tr. 79). He stated that this case might not be the best case for him to sit on but his reasoning for saying as such was because he thought he might have met Susan Nolan in the past; he thought her face looked familiar. (Tr. 79). However, he also indicated to the court that he would be able to be fair and impartial in this case. (Tr. 42).
 {¶ 146} Given the indication that he could be fair and impartial, it is hard to find that the court abused its discretion in not removing Miller for cause. As stated above, deference must be paid to the trial judge's determination that a potential juror can be impartial because it is the trial judge who sees and hears the juror. Wainwright,469 U.S. at 426. Consequently, as the trial court made no error in deciding the challenges for cause, this assignment of error lacks merit.
 BROWN'S SEVENTH ASSIGNMENT OF ERROR {¶ 147} "THE TRIAL COURT ERRED IN ADMITTING IMPROPER EVIDENCE REGARDING COLLATERAL MATTERS WHICH PREVENTED BROWN FROM RECEIVING A FAIR TRIAL."
 {¶ 148} Under this assignment of error, Brown argues that some of the trial court's evidentiary rulings were erroneous. A trial court is vested with broad discretion in determining the admissibility of evidence. Rigby v. Lake County (1991), 58 Ohio St.3d 269, 271. An appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion. Id. citing State v. Finnerty (1989), 45 Ohio St.3d 104, 107.
 {¶ 149} The alleged error complained of is that the Nolans' counsel allegedly referred to Brown twice as the insurance company. The complained of reference occurred in the following colloquy:
 {¶ 150} "Q. [by the Nolans' counsel to their expert Joseph Petitta] And do you limit your involvement to reviewing cases only for claimants or to cases only for insurance companies? How is your work volume distributed?
 {¶ 151} "A. My practice is pretty much split 50/50 between Plaintiffs and Defendants. *Page 27 
 {¶ 152} "Q. And so the jury understands, you're saying Plaintiffs. You're talking about people who are bringing suit?
 {¶ 153} "A. Yes. That's correct.
 {¶ 154} "Q. That would be the claimant and Defendants being the insurance side of the case." (Tr. 383).
 {¶ 155} At this point, Brown lodged an objection. He made the same argument he makes in this appeal — that twice the Nolans' counsel referred to him as the insurance company. The trial court indicated that that Nolans' counsel did not refer to Brown as the insurance company. It explained, "[h]e did ask questions about how is it split but I don't think he referred to your client as the insurance company." (Tr. 384).
 {¶ 156} From the above colloquy, we cannot find that the Nolans' counsel referred to Brown as the insurance company. The questions asked of Petitta were about how often he testified for the claimant and for the insurance company. There was no indication that Brown was the insurance company. The trial court did not abuse its discretion in finding as such.
 {¶ 157} The second alleged improper evidentiary ruling was allowing Edward Vargo to testify. Vargo used to work under Brown. He testified that he had witnessed Brown using inappropriate sales tactics. (Tr. 367). He indicated Brown would write policies when the insured were ineligible for coverage, such as in the instance where they had diabetes. (Tr. 367). However, he did testify that he never told superiors of Brown's work habits and he could not list the names of other recipients or dates of when Brown allegedly wrote policies for ineligible insureds. (Tr. 374).
 {¶ 158} Brown argues that his testimony was improper under Evid. R. 404(B). The Nolans argue that this testimony was used to impeach Brown when he stated that he would never sell a heart policy to a diabetic. Thus, pursuant to Evid. R. 613, they contend it is admissible.
 {¶ 159} Evid. R. 404 governs character evidence. Subsection B provides that evidence of other wrongs or acts are "not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, it may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. R. 404(B). *Page 28 
 {¶ 160} The testimony offered may fall under Evid. R. 404 in that it was used to prove intent for fraud. Similar acts evidence can be used to show intent. State v. Kolvek, 9th Dist. No. 21752, 2004-Ohio-3706. However, Vargo could not testify to specific incidents. He stated that he had witnessed Brown selling policies to ineligible insureds, but he could not indicate which policies that happened in.
 {¶ 161} Regardless, as the Nolans indicate, the testimony was used to impeach Brown. Brown testified that if a person had diabetes he would not sell them the heart policy. Instead, he would sell them an ICU rider. Vargo testified that Brown would sell people with diabetes the heart policy. Thus, Vargo's testimony was used to try to impeach Brown.
 {¶ 162} "Evid. R. 613 governs the procedures for impeachment of a witness by self-contradiction. There are two types of self-contradiction impeachment recognized by Evid. R. 613: prior inconsistent statements and prior inconsistent conduct. Extrinsic evidence of a prior inconsistent statement or prior inconsistent conduct is generally admissible if two conditions are met. See Evid. R. 613(B). First, if the evidence is offered for the sole purpose of impeaching the witness, the proponent must lay the proper foundation and the witness must have the opportunity to explain or deny the inconsistent behavior or conduct. Evid. R. 613(B)(1); State v. Hartman (Apr. 5, 1999), Clermont App. No. CA98-06-040, unreported, 1999 WL 188145.
 {¶ 163} "Second, the subject matter of the extrinsic evidence must be a fact of consequence to the determination of the action other than the credibility of the witness, a fact that may be shown under other Rules of Evidence, or a fact that may be shown by extrinsic evidence under the common law of impeachment. Evid. R. 613(B)(2)." State v. Bowman (2001),144 Ohio App.3d 179, 186-187.
 {¶ 164} Brown's testimony about not selling a heart policy to a person that is ineligible for that policy was inconsistent with Vargo's testimony that Brown did sell policies to ineligible insureds. The subject matter of the testimony regarding whether or not he did this is a fact that is of consequence to this case. Consequently, considering all the above, the trial court did not abuse its discretion in allowing the testimony.
 {¶ 165} The last alleged incorrect evidentiary ruling was the trial court's allowance of Brown's Conseco Application for employment to be introduced and of the introduction of Brown's Tax Lien. The Conseco application was for Brown's *Page 29 
appointment as an independent contractor insurance agent for Conseco. On that application, Brown did not disclose that he had a tax lien. (Tr. 217). He testified that he did not know there ever was a tax lien and that had he known he would have disclosed it. (Tr. 217). The trial court allowed the Notice of Tax Lien and the Conseco Application to be admitted into evidence.
 {¶ 166} The evidence was admissible under Evid. R. 404(b). As referenced above, Evid. R. 404 allows evidence of other crimes, wrongs or acts when it is used to show proof of motive. The Nolans argued and insinuated that Brown failed to disclose the tax lien to ensure that he got a job with Conseco so that he could pay off his debts. They also suggested that Brown's debt, including his tax lien, was the reason he wrote policies to ineligible insureds. Brown received a commission on every policy he sold. Thus, the more policies he sold, the more money he made. Consequently, evidence of his debt and the fact that he did not disclose the tax lien was admissible to show motive. The trial court's admission of that evidence was not an abuse of discretion. The arguments made under this assignment of error lack merit.
 NOLANS' FIRST ASSIGNMENT OF ERROR {¶ 167} "THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF THE DEFENDANT'S LIABILITY COVERAGE AS A PART OF THE PUNITIVE DAMAGE PHASE."
 {¶ 168} Prior to the punitive damages trial, Brown moved for a motion in limine to prevent the Nolans from mentioning that Brown is insured. The Nolans argued that the insurance coverage is permitted at the punitive damages hearing. The trial court granted the motion in limine and when the Nolans attempted to discuss the insurance coverage at the punitive damages trial, the trial court did not permit it. The jury then returned a verdict for no punitive damages. The Nolans filed a Civ. R. 59 motion for new trial arguing that the trial court improperly prohibited them from introducing evidence of insurance coverage and thus, a new punitive damages trial should be granted.
 {¶ 169} We review the trial court's denial of the Civ. R. 59 motion for new trial under an abuse of discretion standard of review. Sharp v.Norfolk W. Ry. Co. *Page 30 
(1995), 72 Ohio St.3d 307, 312. The trial court has broad discretion in permitting or excluding evidence. The determination of whether reference to the liability policy can be brought in is covered by Evid. R. 411. It states:
 {¶ 170} "Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership or control, if controverted, or bias or prejudice of a witness."
 {¶ 171} The Ohio Supreme Court has reviewed the rule and explained:
 {¶ 172} "Given the sophistication of our juries, the first sentence of Evid. R. 411 (`[e]vidence that a person was or was not insured against liability is not admissible upon the issue [of] whether he acted negligently or otherwise wrongfully') does not merit the enhanced importance it has been given. Instead of juries knowing the truth about the existence and extent of coverage, they are forced to make assumptions which may have more prejudicial effect than the truth.
 {¶ 173} "Thus, the second sentence of Evid. R. 411, which allows courts to operate in a world free from truth-stifling legal fictions, ought to be embraced. In such instances as the case at hand, truth should win out over a naively inspired fear of prejudice." Ede v. Atrium S. OB-GYN,Inc., 71 Ohio St.3d 124, 127-128, 1994-Ohio-424.
 {¶ 174} In that case, the Supreme Court determined that evidence of a commonality of insurance interests between a defendant and an expert witness was admissible. It explained that the probative value to show the expert's bias sufficiently outweighed any potential prejudice the evidence of insurance might cause. Id. Thus, it fell within one of the exceptions listed in the rule, to show bias of the witness.
 {¶ 175} Here, the Nolans do not argue that the liability insurance is admissible for any of the exceptions listed in Evid. R. 411. Rather, they argue that at the punitive phase the jury should be aware that there is insurance so that the punitive damages amount can be correctly computed. Thus, such evidence would not fall into the exceptions listed in Evid. R. 411.
 {¶ 176} That said, Evid. R. 411 does not include an inclusive list of exceptions, rather, it provides some examples of when liability insurance can be admissible. As was explained earlier, the exclusionary part of Evid. R. 411 indicates that insurance *Page 31 
liability is not admissible for the purpose of showing that a person acted negligently or wrongfully. The remainder of the rule clearly indicates that it is admissible for other purposes.
 {¶ 177} In this instance, the evidence of insurance would not be used to show that Brown acted wrongfully or negligently. The jury had already determined, without reference to insurance, that Brown acted negligently in the compensatory phase of the trial. In fact, the jury had already determined that Brown acted with actual malice, and therefore, the Nolans were entitled to punitive damages. At the punitive phase, all that had to be determined was the amount of punitive damages. The Ohio Supreme Court has stated, "the exclusionary principle of Rule 411
applies only where liability insurance is offered to establish negligence or culpability." Beck v. Cianchetti (1982), 1 Ohio St.3d 231,236, citing Blackmore Weissenberger, Ohio Evidence (1981), 56. Thus, as the insurance was not being used to show culpability, the exclusionary principle may not be applicable in this case.
 {¶ 178} The purpose of punitive damages is to punish and deter certain conduct. Moskovitz v. Mt. Sinai Med. Ctr., 69 Ohio St.3d 638, 651,1994-Ohio-324. To satisfy those twin aims, a person's financial status is needed. For example, for a person who makes millions of dollars a year, a punitive award of $10,000 would not deter the conduct. That said, the Supreme Court has clearly indicated that it does "not require, or invite, financial ruination of a defendant that is liable for punitive damages." Dardinger v. Anthem Blue Cross Blue Shield,98 Ohio St.3d 77, 102, 2002-Ohio-7113.
 {¶ 179} Thus, it could be argued that in order to bring about those twin aims, the jury should be aware of the use of liability insurance for the coverage of compensation. If from the evidence provided it is clear that a defendant will not be paying any of the compensatory award due to insurance, then maybe the knowledge of that is needed to determine how much should be given for punitive damages.
 {¶ 180} Here, at the punitive damages phase, Brown put on evidence on how much money he makes a year. He offered tax returns from 2001 to 2004, which showed that his taxable income was less than $20,000 for each year. He also offered evidence of his debt and that he had previously filed for bankruptcy. Thus, his evidence was an attempt to show that any punitive damage award would have a great impact on his financial standing. If he was solely liable for the compensatory damage *Page 32 
award, any punitive damage award would have an even greater effect on his financial standing.
 {¶ 181} That said, no Ohio case is directly on point that coverage can be used to determine the appropriate amount of punitive damages. However, we do not have to determine whether or not it is admissible under Evid. R. 411, because the probative value, in this case, does not outweigh the potential prejudice. The trial court was correct in excluding the evidence because the prejudice would be that the insurance would cover the damages when in fact it may not have. Fraud was pled in the complaint and the jury found actual malice. Liability insurance typically does not cover those acts. Brown's policy states that it does not apply to any "Claim" arising out of any act "committed with dishonest, fraudulent, criminal, malicious or knowingly wrongful purpose or intent." The jury verdict specifically found that Brown "was negligent and/or that he committed misrepresentation and/or that he committed fraud in connection with the insurance policy he sold to the plaintiff, Susan Nolan, and that such negligence caused damage to the plaintiffs." 11/30/05 Jury Interrogatories. The jury also found that Brown's "acts or omissions were aggravated or egregious and/or done with a conscious disregard for the rights of others." 11/30/05 Jury Interrogatories. Thus, the injection of insurance may just allow the jury to award an exaggerated amount in the thought that insurance would cover the compensatory, when in fact it may not. The prejudice outweighed the probative value.
 {¶ 182} It is noted at this point that the Nolans argue that the insurance policy covered punitive damages for the first $250,000 and that the jury should have also been aware of that. It must be pointed out that Ohio law is adamantly clear that one cannot insure for punitive damages. Second, as explained above, it is not clear that coverage will apply to these acts, since fraud appears to have been found.
 {¶ 183} As an alternative argument, the Nolans argue that Brown opened the door to the admission of insurance "once he engaged in blatant poormouthing tactics." On cross examination, the following colloquy occurred between the Nolans' attorney and Brown:
 {¶ 184} "Q. You're aware that this jury last year when we were here about six weeks ago made a finding in response to a specific question that your actions or omissions were aggravated or egregious and/or done with a conscious disregard for the rights of others. You are aware of that. *Page 33 
 {¶ 185} "A. Yes.
 {¶ 186} "Q. All right. And you're aware that your attorneys had asked that this portion of the case be separated from the portion that was heard last year by the jury. You're aware of that.
 {¶ 187} "* * *
 {¶ 188} "A. No really, sir. I mean I knew there was those phases but the question that you asked me is did I know that they asked for it. To be honest with you I didn't know.
 {¶ 189} "Q. All right. And you understand that the award that was made by this jury six weeks ago was an award in response to a specific question the amount that would fully and fairly compensate these folks for what they have been through. You're aware of that.
 {¶ 190} "A. Yes.
 {¶ 191} "Q. And this phase of the trial deals with what amount, if any, would be appropriate to serve as a punishment or a message or deterrence to you and others similarly situated to you in the future. You're aware of that.
 {¶ 192} "Mr. Winter [Attorney for Brown]: Objection.
 {¶ 193} "The Court: I'll permit that question but then let's get into the particulars.
 {¶ 194} "A. I'm not sure, Mr. Blass [Attorney for the Nolans]. I just know that so far I owe a hundred thousand dollars. That's what I know." (Tr. 40-41).
 {¶ 195} At that point a side bar was held. The Nolans argued that Brown blatantly stated he owed $100,000 when in fact he knew that insurance would cover the damages. Brown argued that the Nolans' questions were an attempt to bait him into saying something to open the door to this argument. The trial court then stated that the answer was unresponsive to the question and ordered it stricken from the record. (Tr. 45). The jury was then instructed to disregard the last answer of the witness. (Tr. 45).
 {¶ 196} Without determining whether the Nolans baited Brown into the answer, we find that this argument has no merit. The trial court instructed the jury to disregard the answer. A charge to the jury to disregard evidence is sufficient to nullify the prejudicial effect of improper testimony. Suchy v. Moore (1972), 29 Ohio St.2d 99. It is presumed that the jury follows the court's instructions, including instructions to *Page 34 
disregard testimony. State v. Loza (1994), 71 Ohio St.3d 61, 75. In conclusion, this assignment of error lacks merit.
 NOLANS' SECOND ASSIGNMENT OF ERROR {¶ 197} "THE TRIAL COURT ERRED IN REFUSING TO SUBMIT TO THE JURY THE ISSUE OF WHETHER THE PLAINTIFFS WERE ENTITLED TO RECOVER THEIR ATTORNEY FEES ONCE THE JURY DETERMINED THAT THE DEFENDANT HAD, INDEED, ENGAGED IN AGGRAVATED MISCONDUCT."
 {¶ 198} At the end of the punitive damages phase, two forms were given to the jury. The first form was for punitive damages. The jury was instructed, and the form indicated, that if punitive damages were awarded then it should decide if attorney fees should be given. However, if punitive damages were not given, then the jury was instructed that it could not reach the attorney fees issue.
 {¶ 199} The Nolans argue that the trial court's separation of the attorney fees and punitive damages award was incorrect. They additionally argue that the trial court incorrectly determined that the attorney fees award was predicated on an actual punitive damages award. They argue that the trial court erred and a new trial should be granted on that basis.
 {¶ 200} As with the Nolans' first assignment of error, we review the denial of a motion for a new trial for an abuse of discretion. At the heart of this assignment of error is the question when a jury makes a finding of actual malice, but gives no punitive damages, is the plaintiff still entitled to attorney fees?
 {¶ 201} The Fourth District faced a question similar to the one before us. Tulloh v. Goodyear Atomic Corp. (1994), 93 Ohio App.3d 740. InTulloh, the jury awarded $100,000 in compensatory damages. It then stated on its verdict form that, "The plaintiff is not entitled to punitive damages. The plaintiff is entitled to attorneys' fees." The trial court pointed that there may be a problem with this verdict. Counsel and the court agreed to discharge the jury and deal with the problem later. The trial court later vacated the attorney fees award.
 {¶ 202} On appeal, the plaintiff, Tulloh, argued that the jury is presumed to follow the court's instruction and thus it must have found that defendant's, Goodyear, conduct justified punitive damages, however, they must have set the value at zero.
 {¶ 203} In indicating that the award of attorney fees was properly vacated by the trial court, the Fourth District stated: *Page 35 
 {¶ 204} "Most courts hold that the jury must actually award punitive damages before an award of attorney fees is proper. In Digital AnalogDesign Corp. v. N. Supply Co. (1992), 63 Ohio St.3d 657, 662, the court stated:
 {¶ 205} "`[T]he requirement that a party pay attorney fees * * * is a punitive (and thus equitable) remedy that flows from a jury finding of malice and the award of punitive damages. * * * Without a finding of malice and the award of punitive damages, plaintiff cannot justify the award of attorney fees, unless there is a basis for sanctions under Civ. R. 11.' See, also, Davis v. Tunison (1959), 168 Ohio St. 471, 477;Henry v. Akron (1985), 27 Ohio App.3d 369, 371; Howard v. Urey (Sept. 9, 1988), Trumbull App. No. 3889, unreported. But, see, Atram v. Star Tool Die Corp. (1989), 64 Ohio App.3d 388, 392, holding that punitive damages need not be actually awarded, i.e., a finding that punitive damages could properly have been awarded is sufficient to support an attorney fees award." Tulloh, 93 Ohio App.3d at 756.
 {¶ 206} In Tulloh, the court's reasoning implies that there has to be an actual award of punitive damages before attorney fees can be awarded. We agree with that implication. Here, we have no actual award. Rather, we have a finding of actual malice, but an indication that "none" were awarded for punitive damages. Thus, we hold that the trial court did not abuse its discretion in instructing that if no dollar amount was awarded for punitive damages, the issue of attorney fees was not to be addressed. This assignment of error lacks merit.
 NOLANS' THIRD ASSIGNMENT OF ERROR {¶ 207} "THE TRIAL COURT ERRED IN AWARDING COSTS TO THE DEFENDANT, BROWN, FOR THE PUNITIVE PHASE WHERE THE JURY DETERMINED THAT HE HAD, INDEED, ENGAGED IN AGGRAVATED MISCONDUCT."
 {¶ 208} The trial court awarded the costs for the punitive damages phase of the trial to be paid by the Nolans. They contend that this amounted to an abuse of discretion.
 {¶ 209} The decision to award or to decline to award costs is a matter within the discretion of the trial court, and absent an abuse of discretion, it will not be reversed on appeal. Holmes Cty. Bd. ofCommrs. v. McDowell, 169 Ohio App.3d 120, 2006-Ohio-5017, ¶ 43. Civ. R. 54(D) states: *Page 36 
 {¶ 210} "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs."
 {¶ 211} The Nolans contend that Brown was not a prevailing party, and thus, the trial court abused its discretion in awarding costs to him for the punitive damages phase. Brown counters this argument by contending that since no monetary punitive damages were awarded, he was the prevailing party in the punitive damages phase.
 {¶ 212} A "prevailing party" is one in whose favor the decision or verdict is rendered and judgment entered. See Collins v. York (Dec. 22, 2000), 1st Dist. No. C-000125, quoting Hagemeyer v. Sadowski (1993),86 Ohio App.3d 563, 566. A "prevailing party" has also been described as one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."Hensley v. Eckerhart (1983), 461 U.S. 424, 433.
 {¶ 213} Given these definitions, we hold that the trial court did not abuse its discretion in granting costs to Brown for the punitive phase. While Brown did not succeed in the compensatory damages phase since he was found liable and an award of $100,000 was granted against him, he was successful in the punitive phase because the jury did not award any monetary punitive damages. Thus, it is difficult to conclude that he did not succeed on a significant issue. This assignment of error lacks merit.
 CONCLUSION {¶ 214} In conclusion, we find no merit with any of Brown's assignments of error. Likewise, we find no merit with the Nolans' assignments of error. The jury's verdict and the trial court's decision on post-trial motions are hereby affirmed.
DeGenaro, P.J., concurs.
Donofrio, J., concurs.
[1] DeYarmon's testimony at trial was rather important. She indicated that she worked with Susan and was present when Susan asked Brown about Jerry's diabetes and heard him tell Susan that Jerry would be covered. (Tr. 273). *Page 1